EFiled: Feb 02 2017 03:29PM EST
Transaction ID 60155046
Case No. 12651-VCS

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

SHAHID HAQUE,      :
     :
         Plaintiff,      :
     :
         v.      :      **C.A. No. 12651-VCS**
     :
TESLA MOTORS, INC.,      :
     :
         Defendant.      :

## MEMORANDUM OPINION

Date Submitted: December 7, 2016
Date Decided: February 2, 2017

Peter B. Andrews, Esquire, Craig J. Springer, Esquire, and David M. Sborz, Esquire of Andrews & Springer LLC, Wilmington, Delaware; Hung G. Ta, Esquire, JooYun Kim, Esquire, and Natalia D. Williams, Esquire of Hung G. Ta, Esq. PLLC, New York, New York; and Peter Safirstein, Esquire and Elizabeth S. Metcalf, Esquire of Safirstein Metcalf LLP, New York, New York, Attorneys for Plaintiff.

R. Judson Scaggs, Jr., Esquire and Thomas P. Will, Esquire of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware, and Dean S. Kristy, Esquire, Jennifer Bretan, Esquire, and Marie Bafus, Esquire of Fenwick & West, LLP, San Francisco, California, Attorneys for Defendant.

**SLIGHTS, Vice Chancellor**

Tesla Motors, Inc. ("Tesla" or the "Company") designs, manufactures and sells luxury electric vehicles. According to some automobile industry pundits, Tesla has become the "world's most important car company" by designing and building the "best car in the world."[1] Tesla's guidance to the market regularly reports that demand for its vehicles is high. Yet the Company has, at various times, missed its sales guidance. This has caused a Tesla shareholder, the plaintiff, Shahid Haque, to question whether Tesla's "officers and directors have fabricated" certain explanations for "sales misses" to cover up the fact that demand for Tesla vehicles is lower than reported.[2]

Haque has twice demanded to inspect Tesla's books and records pursuant to Section 220 of the Delaware General Corporation Law, 8 *Del. C.* § 220 ("Section 220"). His stated purpose is to investigate possible breaches of fiduciary duty and mismanagement by the officers and directors of the Company in order to determine whether a derivative action is warranted and whether pre-suit demand would be excused. Both demands for inspection were rejected. As permitted by Section 220, Haque has filed a complaint in which he seeks an order requiring Tesla to produce the documents he requested in his demand letters.

---

[1] DX 65; DX 89.

[2] Pl.'s Opening Trial Br. ("Pl.'s Opening Br.") 1.

1

By stipulation of the parties, the matter was tried on a paper record without deposition or live testimony. After carefully reviewing the evidence and the arguments of counsel, I conclude that Haque has failed to demonstrate by a preponderance of the evidence a credible basis from which this Court can infer possible wrongdoing that would warrant further investigation. Accordingly, I decline to compel the Company to produce the requested books and records and will enter judgment in its favor.

## I. BACKGROUND

I have drawn the facts from the exhibits presented during trial and from reasonable inferences that flow from that evidence. While the parties reserved rights to challenge the weight to be given to any of the evidence offered at trial, they stipulated that the evidence was authentic and otherwise admissible.[3]

### A. The Parties

Plaintiff, Shahid Haque, is a Tesla shareholder who has continuously owned his Tesla common stock since April 24, 2014. Tesla is a Delaware corporation with headquarters in Palo Alto, California. It became a public company after an initial public offering in 2010.

---

[3] Stipulated Record and Pre-Trial Stipulation and Order ¶ 4.

**B. Tesla's Business**

Tesla designs, develops, manufactures and sells fully electric vehicles and energy storage products.[4] The Tesla vehicle line currently is comprised of two models, the Model S sedan and the Model X sport utility vehicle.[5] The vehicles are sold to consumers through a network of Tesla vehicle sales and service centers.[6] Deliveries of the Model S began in June 2012; deliveries of the Model X commenced in the third quarter of 2015.[7] Tesla unveiled its third generation vehicle, the Model 3, in March 2016. The Model 3 will reach the market in late 2017 at a lower price point than Tesla's other vehicles and is expected to broaden Tesla's reach to a new segment of electric vehicle consumers.[8] In addition to vehicle sales, Tesla currently operates "Supercharger" recharging stations to service its vehicles throughout the world.[9]

---

[4] PX 35, Tesla Motors, Inc.'s Answer to Verified Compl. Pursuant to 8 *Del. C.* § 220 ("Answer") No. 13.

[5] *Id.* No. 14

[6] *Id.*

[7] *Id.*

[8] PX 24; DX 82–85; DX 93.

[9] *Id.*

By all accounts, the production of Tesla vehicles poses complex design, engineering, and manufacturing challenges. These production challenges have been a subject of many of the Company's public filings and earnings calls,[10] and many reports within the industry and financial press.[11] For example, Tesla's 2015 10-K states that Tesla's vehicles are assembled with over 3,000 purchased parts sourced from a supply chain comprised of more than 350 suppliers around the globe.[12] If a problem surfaces with even one of the component parts, then short-term production of completed vehicles will be adversely affected.[13]

In addition to supply chain challenges, Tesla also confronts unique fulfillment issues. Specifically, the Tesla vehicles are offered with a wide range of options and the Company is continually introducing new features.[14] Customers are encouraged to choose from this extensive list of vehicle configurations and options at the time they order their vehicle. Tesla then custom-builds each vehicle to those specifications.[15] This customized consumer experience presents obvious challenges

---

[10] DX 38–50; PX 7; PX 10.

[11] DX 64; DX 66; DX 71–72; DX 75–76; DX 78–79; DX 104–105; DX 107.

[12] DX 48 at 9. *See also* DX 39 at 11; DX 42 at 4; DX 53 at 23, 32–35.

[13] *Id.*

[14] DX 38 at 23–24; DX 39 at 16–17, 48; DX 42 at 2–4; DX 44 at 3; DX 53 at 32; DX 71.

[15] PX 17; DX 39 at 5.

in the manufacturing and assembly processes.[16]  The Model S and Model X share assembly platforms and this dynamic also, on occasion, has caused disruptions to production and fulfillment.[17]

It is undisputed that Tesla has performed very well in the luxury car segment.[18] In its letter to shareholders reporting 2015 results, Tesla disclosed that the Model S was the top selling sedan in its class (outselling vehicles from Audi, BMW, Lexus, Mercedes and Porsche) and that it was the only vehicle in its class to achieve year-to-year sales growth.[19]  The Company frequently highlights the fact that this success has been achieved without any marketing campaigns or other advertising.[20]  Tesla's revenues have improved substantially each year it has been in operation—rising

---

[16] DX 38 at 23–24; DX 42 at 2, 4; DX 44 at 3.

[17] *Id.*

[18] Trial Tr. 5 ("Well, certainly if you look at the luxury car segment, Tesla is at the top or close to the top [in sales]. We don't dispute that, Your Honor.").

[19] PX 21 at 1.

[20] PX 7 at 2–3 ("[T]hats with no advertising, no endorsements. So we don't pay anyone to pretend that they like our product. If you see our car in a movie, we didn't pay for it to be there. It's just there."); DX 47 at 4 ("One additional note is that Tesla does not advertise. We don't pay for any endorsements.").

from $413 million in 2012 to $4.72 billion through 2016 Q3.[21] These achievements have been celebrated in both the financial and industry press.[22]

Among the performance metrics that Tesla regularly tracks in its quarterly letters to shareholders are the number of vehicles produced and the number of vehicles delivered.[23] On occasion, Tesla has missed its guidance on vehicle production or vehicle deliveries.[24] When its production or deliveries have fallen short of targets, Tesla has consistently maintained that the shortfalls are driven by production issues (*e.g.*, supply chain challenges) not a lack of consumer demand for its vehicles.[25] Haque questions the truthfulness of Tesla's representations to stockholders regarding consumer demand for its vehicles and the extent to which its

---

[21] Tesla Motors, Inc.'s Response to Pl.'s Opening Trial Br., Attachment A (citing Tesla Motors, Inc.'s 2012–2016 Forms 10-K and 10-Q).

[22] *See, e.g.*, DX 87–88 (*Forbes* names Tesla the "World's Most Innovative Company" in 2015 and 2016); DX 89–91 (automobile industry accolades, including from *Motor Trend* and *Car and Driver*).

[23] *See, e.g.*, PX 2 at 1–2; PX 4 at 1; PX 5 at 1; PX 6 at 2–3.

[24] *See, e.g.*, PX 7 at 6; PX 23 at 1; PX 26 at 1.

[25] *See, e.g.*, PX 6 at 2 ("Being unable to increase production fast enough, not lack of demand, is a fair criticism of Tesla."); PX 7 at 3 ("The last question was sort of a demand-related question as well and it really took pains to emphasize demand is not our issue. Production is our issue and being too perfectionist about future products those are legitimate things to be concerned about, but not demand. We have more demand than we can really address and there is a lot of things, levers we could pull to increase that demand which we're not pulling. So, it's really not an issue.").

production capacity allows it to keep up with that demand. These questions prompted him to seek books and records from the Company.

## C. Haque's Books and Records Demands

On June 15, 2015, Haque sent his first demand (the "June 2015 Demand") under Section 220 seeking to inspect Tesla's books and records.[26] His stated purpose was to investigate whether Tesla had "misled shareholders concerning its true manufacturing capacity" for 2014 Q3 and Q4 and 2015 Q1.[27] Tesla rejected the demand on June 21, 2015, on the ground that Haque had not articulated a credible basis for suspecting corporate wrongdoing.[28] The parties continued to talk, however, and on October 13, 2015, Tesla produced 878 pages of documents to Haque's attorneys.[29] Three days later, Haque responded that the document production was inadequate and requested that Tesla supplement the production to address identified deficiencies.[30] On December 17, 2015, Tesla informed Haque that it did not believe

---

[26] PX 16.

[27] *Id.*

[28] PX 17.

[29] Answer No. 79.

[30] PX 18.

he had stated a proper purpose to inspect books and records and that it would not be responding further to the June 2015 Demand.[31]

Several months later, on July 18, 2016, Haque sent Tesla a second demand (the "July 2016 Demand") based on what he identified as new developments in 2016 Q1 and Q2 that supported his right to inspect books and records.[32]  On July 25, 2016, the Company responded by asserting once again that Haque had not articulated a credible basis for suspecting wrongdoing.[33]  Nevertheless, the letter stated that "the Company will undertake to search for documents sufficient to address Mr. Haque's central thesis that 'faltering demand' in 2016 Q1 and Q2 caused the Company to 'concoct' production challenges."[34]  Two days later, Haque followed up with Tesla to seek clarification and confirmation that Tesla did intend to produce the specific books and records requested.[35]  Tesla's counsel responded that there would be no formal response from the Company until August 8, 2016.[36]  When Tesla failed to produce records by that date, Haque filed this action four days later.

---

[31] PX 19.

[32] PX 28.

[33] PX 29.

[34] *Id.*

[35] PX 30.

[36] PX 31.

## II. LEGAL ANALYSIS

While Tesla has challenged the breadth of Haque's demand for books and records, the focus of the parties' trial presentations was on the threshold question of whether Haque has stated a proper purpose for his demand by identifying a credible basis from which it can be inferred that mismanagement or wrongdoing has occurred. Because I find that he has not, I need not reach Tesla's argument that the demand is overbroad.

### A. Section 220's Proper Purpose Requirement

The right to inspect books and records under Section 220 is broad but not unlimited.[37] When seeking books and records (as opposed to a stock ledger or list of stockholders), the stockholder bears the burden of establishing by a preponderance of the evidence that: "(1) such stockholder is a stockholder; (2) such stockholder has complied with [Section 220] respecting the form and manner of making demand for inspection of such documents; and (3) the inspection such stockholder seeks is for a proper purpose."[38]

In his June 2015 Demand, Haque described his purpose for seeking books and records as follows:

---

[37] *City of Westland Police & Fire Ret. Sys. v. Axcelis Tech., Inc.*, 2009 WL 3086537, at *4 (Del. Ch. Sept. 28, 2009), *aff'd*, 1 A.3d 281 (Del. 2010).

[38] *Cent. Laborers Pension Fund v. News Corp.*, 45 A.3d 139, 144 (Del. 2012) (citing 8 *Del. C.* § 220(c)).

[B]ased on our investigation of Tesla's public statements, it appears that Tesla has repeatedly misled investors as to the Company's capacity, in order to create the false impression that the Company is selling (delivering) as much as it can produce. In other words, Tesla has manipulated and understated its manufacturing capacity to create the impression that the level of demand for Tesla's vehicles vastly exceeds Tesla's manufacturing capacity.[39]

He reiterated this theme in his July 2016 Demand: "there is a credible basis for inferring that, in order to create the false impression that Tesla has insatiable demand for its vehicles, Tesla has misled shareholders by misrepresenting the Company's production capacity, its actual production, and the existence of production constraints that have purportedly impacted Tesla's production."[40]

Our Supreme Court has held that "a stockholder's desire to investigate wrongdoing or mismanagement is a 'proper purpose.'"[41] At first glance, therefore, Haque's desire to investigate whether or not Tesla has publicly misled its stockholders appears to state a proper purpose.[42] But merely offering a suspicion of

---

[39] PX 16 at 2.

[40] PX 28 at 1.

[41] *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 121 (Del. 2006) (internal citation omitted).

[42] *Malone v. Brincat*, 722 A.2d 5, 10 (Del. 1998) ("[W]hen directors communicate publicly or directly with shareholders about corporate matters the *sine qua non* of directors' fiduciary duty to shareholders is honesty.").

10

wrongdoing is not enough to justify a Section 220 demand.[43] "Rather, the plaintiff must present 'some evidence to suggest a credible basis from which this Court can infer that mismanagement, waste, or wrongdoing may have occurred.'"[44] "[T]he 'credible basis' standard sets the lowest possible burden of proof" and "may be satisfied by a credible showing, through documents, logic, testimony or otherwise, that there are legitimate issues of wrongdoing."[45] It is, however, a burden the plaintiff seeking inspection must bear; it is not a formality.[46] The purpose of requiring the plaintiff to articulate a "credible basis" when he proffers as his "proper purpose" a desire to investigate corporate wrongdoing is to strike "the appropriate balance between (on the one hand) affording shareholders access to corporate

---

[43] *Axcelis*, 2009 WL 3086537, at *4.

[44] *Id. See also Sec. First Corp. v. U.S. Die Casting & Dev. Co.*, 687 A.2d 563, 565 (Del. 1997) (holding that while the plaintiff "need not actually prove the wrongdoing itself by a preponderance of the evidence," he must show "a credible basis from which the Court of Chancery can infer there is possible mismanagement that would warrant further investigation.").

[45] *Seinfeld*, 909 A.2d at 123. *See also Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752 (Del. Ch. 2016) (same) (citing *Wal-Mart Stores, Inc. v. Indiana Elec. Workers Pension Trust Fund IBEW*, 95 A.3d 1264, 1273 (Del. 2014)) (quotation marks omitted); *Thomas & Betts Corp. v. Leviton Mfg. Co., Inc.*, 681 A.2d 1026, 1032–33 (Del. 1996).

[46] *Sec. First Corp.*, 687 A.2d at 568 ("The threshold for a plaintiff in a Section 220 case is not insubstantial. Mere curiosity or a desire for a fishing expedition will not suffice."); *see also La. Mun. Empls.' Ret. Sys. v. Lennar Corp.*, 2012 WL 4760881, at *3 (Del. Ch. Oct. 5, 2012) ("To permit stockholders to demand corporate books and records based on mere suspicion of wrongdoing would invite mischief and expose companies to indiscriminate fishing expeditions.") (internal citation and quotations omitted).

records that may provide some evidence of possible wrongdoing and (on the other) safeguarding the corporation's right to deny requests for inspection based solely upon suspicion and curiosity."[47]

## B. The Evidence Reveals No Credible Basis to Infer Wrongdoing

Haque's theory of wrongdoing is that undisclosed members of Tesla's board of directors and senior management team have breached their duty of loyalty by consciously issuing a series of false and misleading public statements to Tesla stockholders. The purpose of these false and misleading statements, according to Haque, is to hide low demand for Tesla's vehicles by blaming missed sales guidance on fabricated production issues.[48] The irony of this theory, of course, is that it rests on the notion that Tesla would prefer to tell the market that there are flaws in its

---

[47] *City of Westland Police & Fire Ret. Sys. v. Axcelis Tech., Inc.*, 1 A.3d 281, 287 (Del. 2010).

[48] In the briefing and at trial, the issue arose whether the court could find a credible basis to infer wrongdoing even if Haque could not link any allegedly false statements to a lack of demand. Tesla argued that the Court could not take that leap because Haque's theory depended on linking the two, as the motive consciously to conceal demand would be necessary to sustain a claim for a breach of the duty of loyalty. Haque argued that even if the Court did not find a credible basis to infer that Tesla was actively attempting to conceal low demand for its vehicles through deceit, the Court still might find a credible basis to infer that the misstatements about production capacity were driven by some other nefarious, albeit unidentified, motive. Based on the evidence in the record, I can find no credible basis to infer any materially inaccurate reporting by Tesla, much less that it intended to deceive its stockholders. Accordingly, I need not search for the needle in the haystack to stitch together some other motive Tesla might have to make false reports regarding production or demand.

12

production processes and capacity rather than admit that demand for its vehicles is lower than forecasted. While the theory, on its face, is hard to fathom, I will operate on the assumption that it is hypothetically credible that a company might fabricate production problems as a means to hide low demand for its products.[49] I will focus, instead, on whether the evidence that has been presented reveals any credible basis to infer that Tesla has engaged in this sleight of hand here.

Haque has identified what he contends to be false reporting to stockholders beginning in 2014 Q3 and continuing through 2016. The June 2015 Demand seeks documents that relate to allegedly false public disclosures in 2014 Q3, 2014 Q4 and 2015 Q1. The July 2016 Demand requests documents that relate to allegedly false disclosures in 2016 Q1 and 2016 Q2. In addition to these public statements, Haque points to certain analysts' reports and recent executive departures from Tesla as further evidence that a credible basis to infer wrongdoing exists. Given the sequencing of his demands, it makes sense to address the evidence Haque has offered in support of his inspection right in chronological order.

---

[49] The theory also assumes that Tesla's elaborate ruse to hide low demand by fabricating production challenges in publicly disclosed statements would not at some point be exposed by the thousands of employees who work or used to work in Tesla's assembly facilities and sales and service centers. Here again, I will operate on the assumption that the lack of current or former employee reports of corporate deceit is not evidence that Haque has failed to present a credible basis to infer wrongdoing.

13

### 1. 2014 Q3

In the July 2014 Shareholder Letter, Tesla stated that it planned to produce 9,000 vehicles and to deliver 7,800 vehicles in 2014 Q3.[50] In November 2014, Tesla announced that it had delivered 7,785 vehicles in Q3, consistent with its guidance, but had produced only 7,200 vehicles, 1,800 less than its guidance.[51] Tesla explained that the lower production number was caused by a planned factory retooling shutdown that lasted two weeks longer than Tesla had originally planned.[52]

Haque acknowledges that it would not be credible to infer wrongdoing or mismanagement based solely on the fact that the Company has occasionally missed its vehicle delivery or vehicle production guidance, as it did in 2014 Q3.[53] This concession is well-founded as Delaware law "requires more than a divergence between forward-looking statements and subsequent results" in order to provide a credible basis to infer mismanagement or wrongdoing.[54] Instead, Haque points to inconsistent public statements made by Tesla prior to the factory shutdown in which

---

[50] PX 5 at 4.

[51] PX 6 at 1; PX 7 at 6.

[52] PX 6 at 2.

[53] Trial Tr. 12 ("We are not investigating Tesla because it's tripped up on some publicly-made forecasts. Companies trip up on forecasts all the time.").

[54] *Shamrock Activist Value Fund, L.P. v. iPass Inc.*, 2006 WL 3824882, at *2 (Del. Ch. Dec. 15, 2006).

Tesla described the shutdown and purportedly detailed its anticipated impact on production. The problem with this argument, however, is that the inconsistency upon which Haque relies to suggest wrongdoing simply does not exist.

In the July 31, 2014 Shareholder Letter, Tesla noted that it anticipated the factory retooling would result in a two-week shutdown of production which would affect both production and delivery numbers.[55] Therefore, Haque argues, if the factory was in fact shut down for four weeks, or two weeks longer than anticipated, the logical expectation is that both production and deliveries "would be equally, negatively impacted."[56] Haque notes that Tesla was able to deliver enough vehicles to meet its guidance (7,785 actual deliveries vs. 7,800 guidance), but came up much shorter on its production numbers (7,200 actual production vs. 9,000 guidance). Based on these numbers, Haque extrapolates that Tesla must have held back production or made false claims about production restraints in order to mask low demand.

---

[55] PX 5 at 4. Tesla stated that without the two-week factory shutdown it would have been able to produce about 11,000 vehicles and would have expected to deliver approximately 9,500 vehicles. *Id.*

[56] Pl.'s Opening Br. 31.

Haque's mathematical extrapolation finds no support in the evidence or in basic logic.[57] In fact, Tesla's July 31, 2014 Shareholder Letter indicates that it expected the planned two-week shutdown to reduce production by 2,000 vehicles but to reduce deliveries by only 1,700 vehicles.[58] Therefore, even before any shutdown, Tesla anticipated that the interruption in production would have less impact on vehicle deliveries than on vehicle production. This makes perfect sense, of course, since deliveries could and likely would include vehicles that were produced and in the distribution pipeline prior to the shutdown. Indeed, in 2014 Q3, Tesla delivered 585 more cars than it produced in the quarter.[59] This discrepancy reflects that Tesla delivers cars produced in earlier quarters and that it often chooses to allocate deliveries to customers with shorter delivery times.[60] This, in turn, serves to mitigate the impact of production issues and allows the Company to reach its delivery guidance by making it possible to deliver more vehicles before the close of the quarter.[61] This straightforward, credible explanation for how Tesla was able to

---

[57] *Id. See Sec. First Corp.*, 687 A.2d at 568 (holding that a plaintiff may establish a credible basis to infer wrongdoing "through documents, logic, testimony or otherwise").

[58] PX 5 at 4.

[59] PX 6 at 1 (reporting that deliveries for 2014 Q3 were 7,785); PX 7 at 6 (stating that Tesla produced 7,200 vehicles in 2014 Q3).

[60] *See, e.g.*, PX 9 at 3.

[61] *Id.* ("[W]e manage regional deliveries to balance customer wait times globally.").

meet its vehicle delivery guidance in 2014 Q3, even in the face of a longer than expected assembly line shutdown, leaves no room for a credible basis to infer wrongdoing.

## 2. 2014 Q4

Haque takes issue with several public statements made by Tesla in 2014 Q4 which he contends provide a credible basis to infer that Tesla was intentionally misleading its shareholders regarding vehicle production and demand. First, he points out that Tesla's production in 2014 Q4 was 11,627 vehicles, a 61% increase from the prior quarter.[62] According to Haque, this sudden jump in production capacity is suspicious because the number of vehicles produced in 2014 Q4 "conveniently allowed Tesla to meet its much-touted production guidance of 35,000 vehicles in 2014."[63] He argues that the inference of wrongdoing is reinforced by the

---

[62] PX 9 at 1.

[63] Pl.'s Opening Br. 32. Haque's characterization of the contents of Tesla's disclosures to stockholders regarding 2014 year-end production guidance is misleading. While Haque states that Tesla first announced a year-end production target in its July 31, 2014 Shareholder Letter, that letter contains no specific year-end production target or number. In fact, if Tesla's quarterly production results up to that point in the year are added to its disclosed estimates of production going forward for the year, it is evident that as of July 31, 2014, Tesla expected to produce in excess of 35,000 vehicles in 2014. Far from being "much-touted," Tesla's expectation for full-year production was first pegged at 35,000 vehicles in its November 5, 2014 Shareholder Letter when it stated "[p]roduction for the full year is expected to be about 35,000 cars . . .". PX 6 at 3. At the time the November letter was sent in the middle of 2014 Q4, Tesla had increased its production after building a new assembly line, all of which was to be expected, as Tesla had disclosed back in July 2014 that production would increase for 2014 Q4. PX 5 at 2.

17

fact that Tesla *delivered* just 9,834 vehicles in 2014 Q4, approximately 2,000 vehicles less than Tesla *produced* in that same period. By Haque's lights, "[t]his supports the inference that, on the one occasion the Company needed to report a higher quarterly production figure . . . it did so, but with the risk that it could not actually deliver all these vehicles."[64]

Tesla identified several delivery challenges that explain the lower delivery numbers, including "customers being on vacation, severe winter weather and shipping problems (with actual ships)."[65] Haque discredits these explanations, noting that Tesla used the same "excuse" two years before.[66] Indeed, according to Haque, the explanations are now demonstrably false given revelations contained in a recent biography of Elon Musk, Tesla's Chairman and CEO, in which the author reports that Tesla experienced difficulties "during the latter stages of 2012" converting pre-sale reservations into actual sales.[67] Haque also claims that the gap between vehicle production and deliveries in 2014 Q4 contradicts prior statements in which the Company reported that it expected the quarterly gap between

---

[64] *Id.*

[65] PX 9 at 1.

[66] PX 2 at 1.

[67] PX 15.

18

production and deliveries to decline in future quarters.[68] Stacking this evidence on pallets linked by inferences, Haque argues that there is a credible basis to infer that Tesla had more production capacity than it previously disclosed, that it used this excess capacity to hit its guidance of producing 35,000 vehicles in 2014, that it was not able to sell all of the produced vehicles because demand was much lower than reported, and that it was forced, therefore, to make materially false and misleading statements about the existence of delivery problems in order to cover up the lack of demand for Tesla vehicles.

Haque's chain of inferences hardly yields a credible basis to infer wrongdoing. First, Haque ignores altogether the fact that the spike in production in 2014 Q4 followed a factory retool that was undertaken for the very purpose of increasing vehicle production.[69] In fact, the only logical inference is that Tesla increased its production guidance because it expected that the increased factory capacity would, as intended, allow it to produce more vehicles. Indeed, the Court need not rely upon inferences; Tesla's public statements reveal that it anticipated its production capacity to expand after the retool. For example, in the Shareholder Letter in which Tesla announced its expected quarterly production numbers for the

---

[68] PX 4 at 4.

[69] PX 5 at 2.

year going forward, the Company stated that it was building a new assembling line and adding more automation in order to increase capacity, and that after a ramp-up period, it expected to be able to meet its 2014 guidance.[70] That vehicle production spiked as intended is a reflection of sound planning, not corporate wrongdoing.

Haque's heavy reliance upon the Musk biography is misplaced. The first problem is a matter of evidence. The statements in the biography, offered by Haque "to prove the truth of the matter[s] asserted," are classic hearsay.[71] Haque has failed to identify any applicable exception to the hearsay rule and I can discern none. Even if I was to look beyond the hearsay problem, Haque has not provided any foundation that would allow me meaningfully to assess the credibility of this evidence. When confronted with this concern at trial, Haque's counsel acknowledged that there was "certainly a risk" the biography contained inaccurate information, but urged me to consider it nonetheless as part of the "documents, logic and inferences that we combine together to suggest a credible basis."[72] Without more, the biography does not persuade me as the factfinder.

---

[70] *Id.*

[71] D.R.E. Rule 801(c).

[72] Trial Tr. 24. *Sec. First Corp.*, 687 A.2d at 568 ("[T]he threshold may be satisfied by a credible showing, through documents, logic, testimony, or otherwise, that there are legitimate issues of wrongdoing.").

Even if I could assess the credibility of the biography, I am not convinced that the excerpts Haque has plucked from the book (or other articles by the same author) support his assertion that Tesla's statements about delivery issues are false. The statements Haque relies upon from the Musk biography and related articles reveal only that Tesla experienced some growing pains early in its corporate existence that were exposed when it had difficulty turning reservations into sales and when customers in 2012 expressed frustration with certain design and performance bugs.[73] Based on these descriptions of Tesla's actual challenges in 2012, Haque argues that Tesla's contemporaneous disclosures to stockholders of delivery challenges must have been false. And if the excuse was phony in 2012, it must also be phony in 2014.

Once again, Haque sees an inconsistency that simply is not there. Tesla's public statements about delivery issues in 2012 focused on the challenges of delivering during the holiday season when customers are less available for pickups and weather can impede customer access to the sales centers. Nothing in this statement suggests that Tesla was not also experiencing bugs in the design or performance of its vehicles, or that Tesla did not encounter some difficulty in converting reservations to sales. Indeed, the fact that Tesla has provided the same description of delivery challenges that have arisen in the same quarter for different

---

[73] PX 13 at 2.

years more likely reveals that the explanations are truthful. The inference that Haque would have the Court draw—that Tesla has the same convenient but false excuse stashed away each time it wants to hide demand issues at the end of the calendar year—does not flow logically from the evidence he presented at trial.

Finally, I cannot leave my consideration of Haque's arguments relating to 2014 Q4 without raising an overarching question that Haque has left unanswered. Haque's theory of wrongdoing is that Tesla regularly makes up production challenges as cover for the ongoing lack of demand for its vehicles. Yet, according to Haque, Tesla was willing to let the cat out of the bag and reveal its true production muscle in 2014 Q4 so that it could meet its 2014 production guidance of 35,000 vehicles. But why? What was so important about the 2014 production guidance that would cause Tesla to undermine its mantra that limited production capacity was the sole reason it has missed and might in the future miss its delivery guidance? Tesla had missed its production guidance before and, as noted, the 35,000 vehicle target was not really a target at all. If concealing low demand is so important to Tesla that it is willing deliberately to mislead its stockholders, then why risk exposing the lie? The answer, in my mind, is simple; there is no lie to conceal.

### 3. 2015 Q1

Haque next questions why Tesla's production guidance in 2015 Q1 was only 10,000 vehicles when it had just produced 11,627 vehicles in the prior quarter. In a

February 11, 2015 Shareholder Letter, Tesla explained that its target was 10,000 vehicles "due to it being a shorter quarter than in Q4 and approximately a week of factory downtime to allow the workforce to rest and tooling upgrades."[74] Haque claims this explanation offers a credible basis to infer wrongdoing for two reasons.

First, Haque points to the calendar and counts that 2014 Q4 is only two production days shorter than 2015 Q1, "not one week" shorter as represented by Tesla.[75] Haque has misquoted Tesla's statement. The Company never claimed that 2015 Q1 was shorter than 2014 Q4 by one week; it merely observed that 2015 Q1 was shorter than 2014 Q4. By Haque's own math, Tesla was telling the truth. Without more, Haque is left to quibble over whether, in fact, the two quarters were practically the same length due to holidays.[76] I found no basis at all, credible or otherwise, to infer wrongdoing from this "discrepancy."

Second, Haque again points to the Musk biography to argue that Tesla's explanation that production would be down in 2015 Q1 because it would be giving workers time off to rest after a particularly busy quarter is "dubious" because Tesla

---

[74] PX 9 at 4.

[75] Pl.'s Opening Br. 35.

[76] Trial Tr. 22 ("And if you look at the fourth quarter, it's actually a Thanksgiving holiday there which takes away about two production days. So if you compare the first quarter with the fourth quarter, it really isn't short by any number of days.").

offered a similar explanation to justify low production in 2013.[77] Haque acknowledges that he relies exclusively upon the accuracy of the Musk biography to support his contention that Tesla lied when it forecast its production for 2015 Q1.[78] For reasons already stated, I am not inclined to rely on an untested biography as a basis to infer corporate wrongdoing, particularly when this is the only evidence Haque can muster.

Moreover, even if I were to credit the biography, it is clear once again that Haque has mischaracterized the evidence upon which he relies. Haque's premise is that Tesla's attempt to use the "we rested our workers after a busy end-of-year 2012" excuse in 2013 Q1 to justify low productions numbers that quarter was exposed as false by the Musk biographer. Thus, the same explanation in 2015 must also have been false. The biography characterizes Tesla in mid-February, 2013 as being in a "crisis state."[79] It then describes events that occurred "[d]uring the first week of April" when "[t]he situation got so bad" that Musk, after conferring "with his friend

---

[77] PX 2 at 4.

[78] Trial Tr. 28 ("THE COURT: Just so I can be clear as I'm looking through the evidence, is there anything else that you would point to that reveals, as you are contending, that the 2013 statement to shareholders was false with respect to the reason for the scale-back of production? MR TA: It rests entirely on the Ashlee Vance biography, Your Honor.").

[79] PX 15 at 305.

Larry Page at Google[,]" at some point thereafter "shut down [the] factory."[80] According to the biography, even though the shutdown was motivated by Musk's survival instinct, Tesla stated "[p]ublicy [that] it needed to conduct maintenance on the factory," which, the biography acknowledges, "was technically true, although the company would have soldiered on had the orders been closing as expected."[81] Haque points to this description to support his contention that Tesla lied in 2013 Q1 when it described the shutdown after the end of year ramp-up in 2012 and may have lied again when it blamed a factory shut-down for its missed production guidance in 2015 Q1.

The connection Haque is trying to draw between 2013 Q1 and 2015 Q1 is lost on me. Again, the point of the connection is to demonstrate that Tesla's explanation as to why it did not sustain its production capacity from 2014 Q4 into 2015 Q1 is not credible because it offered a similar, now-discredited explanation in 2013 Q1. To be sure, Tesla did report that it rested its workers in early January 2013 after an exhausting production ramp-up at year-end 2012.[82] But that is not the event described in the biography. Rather, the biography describes a factory shutdown that occurred in late April or perhaps May of 2013, months after the January 2013

---

[80] *Id.*

[81] *Id.* at 305–06.

[82] PX 2.

shutdown and near the end of 2013 Q1 or perhaps even the beginning of 2013 Q2. Thus, the Musk biography does nothing to undermine Tesla's explanation in 2013, and again in 2015, that it would likely have lower production in the first quarter of those years because it had elected to give its workers a week off after a busy production cycle the month before. The events described in that book are totally disconnected from what Haque is trying to demonstrate here.

### 4. 2016 Q1

Turning next to 2016 Q1, Haque takes issue with the explanation given by Tesla for why it missed its delivery guidance of 16,000 vehicles. Tesla delivered 14,820 vehicles and attributed the lower number to production constraints. In an announcement to shareholders, Tesla stated that "[t]he Q1 delivery count was impacted by severe Model X supplier parts shortages in January and February that lasted much longer than initially expected."[83] Haque doubts this explanation based on what Tesla said earlier in the quarter when it reported to shareholders that vehicle production had been limited in January 2016 in order to maintain quality production standards but that "[w]e are already seeing improvement from these efforts and we are now significantly increasing our Model X production throughout the balance of

---

[83] PX 23 at 1.

the quarter."[84] He argues that because Tesla reassured shareholders that any production issues had been resolved by February 10, the explanation at the end of the quarter that Tesla did not reach its delivery guidance due to issues in January and February which lasted longer than expected might be false. According to Haque, it is "inconceivable" that when Tesla updated its shareholders in February it was unaware of the disruption in vehicle deliveries that might be caused by the earlier production difficulties.[85] Therefore, either the statement that the production problems had been resolved is false or the statement explaining the missed delivery guidance at the end of the quarter is.

Once again, Haque mischaracterizes what Tesla disclosed. In its February 2016 letter to shareholders, Tesla admitted some production issues had occurred in January and then stated that "we are already seeing improvement from these efforts."[86] From this, Haque concludes that Tesla was telling its shareholders that all issues had been resolved. But "seeing improvement" with respect to an issue is not the same as "resolving" that issue. The fact that Tesla stated in early February

---

[84] PX 21 at 4.

[85] Pl.'s Opening Br. 25.

[86] PX 21 at 2. In fact, the senior executives at Tesla were uniquely positioned to know whether production issues were improving given that Elon Musk has publicly stated that during this period his desk was moved to the end of the assembly line and he had "a sleeping bag in a conference room adjacent to the production line" which he used frequently. *See* DX 49 at 3.

that it was seeing improvements in production issues, and then later reported that the production issues lasted longer than expected, is no basis to infer possible wrongdoing.

## 5. 2016 Q2

Finally, Haque argues that Tesla made false statements in 2016 Q2 about production issues in order to explain away missed delivery guidance. On May 4, 2016, the Company forecasted production of 20,000 vehicles and delivery of 17,000 vehicles.[87] At the end of the quarter, however, Tesla announced that it had only delivered 14,730 vehicles.[88] Tesla explained that the number of deliveries was lower because half of the quarter's production took place in the final four weeks.[89] Due to this steep production ramp, more than 5,000 produced vehicles had not yet been shipped to customers and would be delivered, instead, in 2016 Q3.[90]

Echoing his theme, Haque finds Tesla's explanation for the missed delivery guidance to be implausible for several reasons. First, according to Haque's math, Tesla entered the quarter with enough production capacity to deliver 17,000 vehicles without any production ramp. While Haque's math is hard to follow, it is clear in

---

[87] PX 24 at 3.

[88] PX 26.

[89] *Id.*

[90] *Id.*

28

any event that his three-part criticism of the 2016 Q2 statements does not take him where he wants to go.

First, Haque says that in 2016 Q1, Tesla produced 15,510 vehicles, so it exited that quarter with a baseline of 15,510 vehicles per quarter.[91] Haque believes, however, based on Tesla's statements, that the Company exited 2016 Q1 with an even higher production level.[92] He says that Tesla disclosed that "by the last full week of March, the build rate rose to 750 Model X vehicles per week."[93] At this per week capacity, Tesla would be able to produce 9,750 Model X vehicles in a quarter (13 weeks x 750 Model X/week). If Tesla had been operating at this capacity throughout the entirety of 2016 Q1, then it would have been able to produce over 22,000 vehicles (9,750 Model X vehicles + 12,851 Model S vehicles). Therefore, argues Haque, no production ramp would be necessary to produce the 18,000+ vehicles in 2016 Q2.

Second, Haque hypothesizes that if half of the 18,000+ vehicles were produced in the final four weeks of the quarter, then Tesla's average monthly production for the beginning of the quarter would have been less than the average monthly production in 2016 Q1. Haque figures that if approximately 9,000 vehicles

---

[91] PX 24 at 2.

[92] Pl.'s Opening Br. 27.

[93] PX 23.

were produced in June alone, then 9,000 were produced in both April and May, for an average of 4,500 vehicles per month.[94] This would be less than the average monthly production in the prior quarter of 5,170 vehicles per month (15,510 total vehicles/3 months) and significantly less than the 7,300 vehicles per month Tesla would be capable of producing if Haque's estimate about Tesla's true production capacity entering 2016 Q2 is correct (22,000 total vehicles/3 months).

Third, Haque maintains that an extreme production ramp would contradict two prior Company statements during the quarter. On April 4, 2016, the Company stated that its "production is now on plan" and made no mention of the need for a late quarter production ramp.[95] Then in May, the Company made its forecast of 17,000 vehicle deliveries and again did not mention the need for any production ramp having already seemed to account for the effect of any deliveries that might spill over into 2016 Q3.[96] According to Haque, the fact that Tesla would not have known about the existence of potential production issues halfway through the quarter is, once again, "inconceivable."[97]

---

[94] Pl.'s Opening Br. 28.

[95] PX 23.

[96] PX 24 at 3.

[97] Pl.'s Opening Br. 2 (stating that for both 2016 Q1 and Q2 Tesla's lack of knowledge is inconceivable); THE PRINCESS BRIDE (20th Century Fox 1987) (Vizzini: "Inconceivable!"

Notwithstanding Haque's convoluted mathematical exercise, his effort to show that Tesla had enough production capacity in 2016 Q2 to reach its vehicle deliveries guidance without a production ramp reflects a basic misunderstanding of Tesla's complex manufacturing process. Haque's counsel agreed at trial that the context in which Tesla does business is important.[98] Yet Haque insists that the Court can and should draw an inference of fabricated demand by taking average monthly production numbers and extrapolating them to other quarters. This exercise might make sense in certain industries but it makes no sense when the manufacturing process is indisputably complex and depends, *inter alia*, on a large and interconnected supply chain. While some consistency in production levels is to be expected, merely highlighting that average production levels (weekly, monthly, quarterly, etc.) dropped from a prior quarter is not enough to support an inference that Tesla could be fabricating the timing of its vehicle production in order to mislead investors about why it cannot meet its vehicle delivery guidance.

Furthermore, it is perfectly reasonable that Tesla would communicate with stockholders twice in 2016 Q2 without mentioning any need for a late quarter production ramp. Simply because Tesla did not foresee production challenges it

---

Inigo Montoya: "You keep using that word. I do not think it means what you think it means.").

[98] Trial Tr. 21 ("Granted, Your Honor, and I think 'context' is the right word. I think you have to look at the context.").

might face later in the quarter does not support an inference that its statement halfway through the quarter that it expected to produce 20,000 vehicles and to deliver 17,000 was false when made.[99] Nor does it support a basis to infer that Tesla's explanation that it initiated a production ramp at the end of the quarter to meet its guidance was a falsehood meant to cover its tracks.

### 6. Analysts' Reports and Executive Departures

Haque's final attempt[100] to present evidence that would provide a credible basis to infer wrongdoing is to cite a handful of negative analyst reports, including one which recounts the departure of several Tesla executives since June 2015. This court has previously held "that negative news articles alone are insufficient bases on which to justify a Section 220 demand."[101] This is all the more true when those articles are not written by independent news agencies, but by authors with a personal interest in swaying the public perception of the Company, such as short sellers.[102]

---

[99] *Shamrock*, 2006 WL 3824882, at *2 (holding that a plaintiff must do more than expose bad forecasting to offer a credible basis to infer wrongdoing).

[100] I note that on January 11, 2017, counsel for Haque sent a letter to the court attaching additional evidence that he contended provided further support for his bid to compel Tesla to produce books and records. This submission was procedurally improper as the parties agreed the evidentiary record was closed at the end of trial. Even if I were to consider Haque's newly proffered evidence, however, it is clear to me that it is more of the same evidence I have already concluded does not support a credible basis to infer wrongdoing.

[101] *Lennar*, 2012 WL 4760881, at *4.

[102] PX 27 (CNBC business report quoting famed short seller who stated that the last time he saw as many senior executives depart a company was Valeant); *See also* Trial Tr. 45

In any case, the articles cited by Haque consist of little more than speculation that Tesla may not be producing at capacity. Moreover, it is unremarkable that a relatively young Silicon Valley-based company has experienced some executive turnover, even at senior management levels, and that fact, either alone or added to Haque's other evidence, certainly does not allow an inference of wrongdoing.

## III. CONCLUSION

As noted, the purpose of requiring a stockholder to demonstrate a credible basis to infer wrongdoing that warrants further investigation is to strike "an appropriate balance between encouraging productive Section 220 actions where there is a reasonable likelihood of wrongdoing while preventing inspections without a factual basis from draining corporate resources."[103] I am convinced that denying the request for inspection in this instance strikes that balance. When viewed in the aggregate, Haque's evidence amounts to nothing more than "suspicion or curiosity."[104] Therefore, the request to inspect Tesla's books and records under both the June 2015 Demand and the July 2016 Demand is DENIED. Judgment will be entered for the Defendant; each party shall bear its own costs.

---

(plaintiff's counsel acknowledging "[t]here would be a question about [the authors'] motives, undoubtedly, Your Honor . . .").

[103] *Lennar*, 2012 WL 4760881, at *3 (citing *Seinfeld*, 909 A.2d at 122–23).

[104] *Axcelis*, 2009 WL 3086537, at *4.